UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JUDITH A. WALLACE,

           Plaintiff,

v.                                               Case No.  5:07-cv-344-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

           Defendant.
_____/

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 1.) The Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their respective positions. (Docs. 16 & 17.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On October 1, 2004, Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income, alleging a disability onset date of March 15, 2004. (R. 71-73.)   Plaintiff's applications were denied initially and upon reconsideration. (R. 20-29, 41-46, 49-51.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 30-31, 34.) The ALJ conducted Plaintiff's administrative hearing on January 27, 2007. (R. 343-55.) The ALJ issued a

decision unfavorable to Plaintiff on March 20, 2007. (R. 9-18.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied. (R. 4-6.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[11] Fourth, if a claimant's impairments do

---

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[12] 20 C.F.R. § 404.1520(e).

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996,
(continued...)

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. **SUMMARY OF THE RECORD EVIDENCE**

Plaintiff was fifty six (56) years old at the time of the ALJ's decision on March 20, 2007. (R. 71, 345.) She has a sixth grade education[22] and has previous work experience as a janitor, chicken processing plant laborer, and flower factory laborer. (R. 80-81, 346-47.) Plaintiff contends that she has been unable to work since March 15, 2004, due to diabetes, hypertension, depression, high cholesterol, leg problems, mini-

---

[17](...continued)
1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See* id.

[21] *See* Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

[22] (R. 85, 346.)

5

strokes, and chronic obstructive pulmonary disease. (R. 79, 110.) Plaintiff is insured for benefits through June 30, 2009. (R. 64.)

The ALJ determined that Plaintiff has the following severe impairments: diabetes, hypertension, depression, degenerative disc disease, and chronic obstructive pulmonary disease. (R. 14-15.) However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R. 15.)

The ALJ then found that Plaintiff retained the RFC to perform a full range of medium work activity. (R. 15.) In addition, the ALJ limited Plaintiff to avoiding concentrated exposure to pulmonary irritants. (R. 15.) As for mental impairments, the ALJ found that Plaintiff has no functional limitations as a result of her depression. (R. 15.) After finding that Plaintiff could perform her past relevant work as a janitor and chicken processor, the ALJ concluded that Plaintiff was not disabled. (R. 17.)

The ALJ found the Plaintiff's impairments of diabetes, hypertension, depression, degenerative disc disease, and chronic pulmonary disease were "severe" impairments at step two of the sequential analysis. Because Plaintiff does not challenge the ALJ's finding on appeal, the Court will limit its discussion to those impairments.

Plaintiff's medical records demonstrate a history of type II diabetes mellitis for which she takes medication. (R. 147.) During her consultative examination with Dr. Dantuluri P. Raju in February 2005, Plaintiff denied suffering any complications as a

6

result of her diabetes. (R. 237.) Plaintiff also has a history of hypertension which is apparently well controlled by medication. (R. 223-25.)

In February 2005, Plaintiff underwent a consultative psychological examination with licensed psychologist, Dr. Colleen Character, Ph.D. (R. 231-34.) Plaintiff complained of decreased energy and appetite, intermittent crying spells and sleep disturbances. Plaintiff denied having any hallucinations or suicidal ideations. She also reported that she did "pretty well from a mood standpoint" so long as she took her medications. Dr. Character noted that Plaintiff had never sought nor received treatment from a mental health care provider but had been taking an anti-depressant prescribed by her family physician. (R. 232.) Mental status examination revealed Plaintiff was alert and oriented with appropriate affect and good eye contact. Plaintiff's speech was intact and she demonstrated average short term memory skills. (R. 233-34.) Dr. Character noted that Plaintiff started smoking cigarettes at the age of 14. (R. 232.)

State agency non-examining psychologists completed psychiatric review technique forms in March 2005 and August 2005. (R. 241-54, 300-13.) In March 2005, the reviewing psychologist noted that Plaintiff was capable of performing all of her activities of daily living, she got along well with her friends and family, and that her medication seemed to adequately manage her symptoms of depression and anxiety. Accordingly, the reviewing physician concluded that Plaintiff did not suffer from a severe mental impairment. (R. 241-54.) In August 2005, the second reviewing psychologist found that Plaintiff's memory and concentration were intact, and there was no evidence

of a cognitive or thought disorder. (R. 300-13.) The reviewing physician opined that Plaintiff's mental impairment was not severe.

Plaintiff has a history of arthritis, bone spurs, and back pain. (R. 289A, 295.) Plaintiff reported to her treating physician at the Marion County Health Department Clinic in May 2004 with complaints of feeling weak, vomiting, headache, and a racing heart. Physical examination revealed muscle spasms and tenderness in Plaintiff's left paralumbar area, but there was no swelling or muscle weakness noted and the straight leg raise test was negative bilaterally. The physician's impression was lumbar back pain with radiculopathy. (R. 157-58.) In November 2004, Plaintiff returned with complaints of mid back pain. X-rays of her thoracic spine revealed moderate degenerative changes. Plaintiff's treating physician prescribed ibuprofen as needed for pain. (R. 289A, 295.)

During Plaintiff's consultative examination with Dr. Raju in February 2005, Plaintiff did not complain of back pain. Examination revealed Plaintiff was able to get up and walk with a normal gait unassisted and did not have difficulty getting on and off of exam table. Dr. Raju observed normal range of motion in Plaintiff's cervical and lumbar spine with no stiffness or tenderness noted. Plaintiff's neurological exam was intact with normal and symmetrical reflexes, and no observed muscle atrophy or strength deficits. (R. 235-40.)

In April 2005, Plaintiff reported to her treating physician with complaints of back pain that intensified with bending activities. (R. 285.) Her physician recommended she take over the counter ibuprofen as needed for pain. Plaintiff returned to her treating physician with complaints of back pain in September 2006. (R. 329.) Physical

examination revealed tenderness in her right sacro-iliac joint. Plaintiff demonstrated a normal range of motion in her hips but was hyperreflexic. She was diagnosed with lumbar back pain with radiculopathy. Her physician once again recommended over the counter medication for treatment of her back pain. Thus, despite her numerous subjective complaints of back pain, physical examinations have revealed minimal clinical findings prompting her physicians to recommend only minimal treatment via over the counter medications as needed for pain relief. Notably absent from the record is any indication that any of Plaintiff's physicians referred her for additional treatment from an orthopedist, pain management specialist, or physical therapist.

Despite Plaintiff's diagnosis of COPD, clinical findings specific to Plaintiff's pulmonary functioning have been largely benign and/or inconsistent with a disabling condition since 2002. Between September 2002 and December 2006, physical examinations of Plaintiff's lungs were consistently unremarkable. (R. 146-47, 161-62, 164, 168, 171, 173, 177, 180, 183, 184, 186, 189, 224, 239, 284, 285, 286, 288A, 289A, 290A, 327, 329, 332.) In September 2002, a chest x-ray showed no evidence of pulmonary disease. (R. 146-47.) In August 2003, Plaintiff reported wheezing but an x-ray of her chest was normal. (R. 141-43.) In January 2004, her treating physician instructed her to engage in moderate exercise. (R. 167.) In addition, Plaintiff's medical records consistently note her long history of tobacco use and/or her physician's instructions to quit smoking. (146-47, 173-74, 177-78, 189-90, 220, 231-34, 235-40, 289A, 327-31.) Despite the overwhelming lack of objective clinical findings, Plaintiff has regularly complained of shortness of breath. (R. 146-47, 235-40, 284, 289, 290, 331.)

Beginning in May 2004, abnormal clinical findings began to sporadically appear. In May 2004, Plaintiff denied having shortness of breath, but physical examination of her lungs revealed occasional abnormal sounds upon expiration of breath. (R. 157.) In December 2004, Plaintiff reported to the emergency room with complaints of chest discomfort, chest pain and a chronic cough and was subsequently admitted for observation. Physical examination (including examination of Plaintiff's lungs) was unremarkable. However, during her stay at the hospital, a chest x-ray and a CT scan were performed of Plaintiff's chest and revealed findings suggestive of obstructive lung disease (R. 228, 230.) Plaintiff was ultimately discharged from the hospital with a diagnosis of chest pain of unknown etiology. (R. 221-25.) After her discharge, she followed up with her treating physician complaining that she had shortness of breath with any physical exertion. (R. 290.)

Plaintiff underwent pulmonary function testing (PFT) at Munroe Regional Medical Center in February 2005. (R. 275.) The forced expiratory volume ($FEV_1$) maneuver was only performed once. In March 2005, Plaintiff saw Dr. Edward Demmi for further pulmonary function testing pursuant to the Social Security Administration's direction. (R. 255.) Her three pre-bronchodilation efforts registered $FEV_1$ results of 1.35 L, 1.26 L, and 1.28 L. (R. 256.) These results were 48 percent of the predicted values.[23] Her three post-bronchodilation efforts registered $FEV_1$ results of 1.49 L, 1.44 L, and 1.41 L. (R.

---

[23] (R. 255.) This percentage was calculated based upon the predicted value for a person of 67 inches without shoes, Plaintiff's height as recorded by Dr. Demmi in March 2005. (R. 256.)

256.) These results were 53 percent of the predicted values. Dr. Demmi's impression was that the testing indicated a moderate restrictive ventilatory defect. (R. 255.)

Pulmonary function testing of Plaintiff was attempted in April 2005 at Munroe Regional Medical Center. (R. 271-76). However, the test results were incomplete as a result of defective testing equipment. (R. 276.)

In April 2005, Plaintiff reported her shortness of breath symptoms were "not as bad." (R. 285.) A month later, Plaintiff returned complaining that her breathing problems were not resolved by the prescribed inhaler. (R. 284.)

Plaintiff returned to Dr. Demmi for additional pulmonary function testing in August 2005. (R. 314-18.) Her three pre-bronchodilation efforts registered $FEV_1$ results of 1.41 L, 1.40 L, and 1.52 L. (R. 318.) These results were 76 percent of the predicted values.[24] Since Plaintiff's $FEV_1$ results were greater than 70 percent, Dr. Demmi did not perform post-bronchodilator manuevers.[25] Accordingly, Dr. Demmi's impression was that testing indicated a possible early chronic obstructive pulmonary disease. (R. 314.)

In September 2006, Plaintiff presented to her treating physician with complaints of a chronic cough and shortness of breath. Upon physical examination, the physician observed abnormal respiration and she was diagnosed with COPD. (R. 331.) Plaintiff returned for a follow up visit later that month and Plaintiff reported that her "bronchitis symptoms had resolved." Physical examination revealed a normal lung exam. (R. 329.)

---

[24] (R. 314.) This percentage was calculated based upon the predicted value for a person of 57.5 inches without shoes, Plaintiff's height as recorded by Dr. Demmi in August 2005. (R. 315.)

[25] See 20 C.F.R. pt. 404, subpt. P, app. 2, § 3.00(E).

There are two physical RFC Assessments performed by non-examining state agency physicians. (R. 263-70, 319-26). In March 2005, a non-examining state agency physician, Dr. Nicholas H. Bancks, completed a Physical RFC Assessment of Plaintiff. (R. 263-70.) Based on his review of the records, Dr. Bancks found that Plaintiff was capable of light work subject to postural and environmental limitations. Specifically, Dr. Bancks opined that Plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk about 6 hours in an eight hour work day (with normal breaks); and sit for about six hours in an eight hour work day (with normal breaks). Dr. Bancks found Plaintiff was capable of frequently climbing ramps and stairs, stooping, kneeling, crouching, and crawling; occasionally balancing; but never climbing ladders, ropes or scaffolds. Dr. Bancks also recommended that Plaintiff should avoid concentrated exposure to pulmonary irritants and hazards (*e.g.*, machinery, heights). In making his assessment, he noted Plaintiff's numerous abnormal allegations were "not objectively corroborated." (R. 268.)

In September 2005, a second non-examining state agency physician, Dr. Donald W. Morford, completed a Physical RFC Assessment of Plaintiff. (R. 319-26.) Based on his review of Plaintiff's medical records, Dr. Morford found that Plaintiff was capable of medium work subject to postural and environmental limitations. Dr. Morford opined that Plaintiff could lift and carry 25 pounds frequently and 50 pounds occasionally; stand and/or walk about 6 hours in an eight hour work day (with normal breaks); and sit for about six hours in an eight hour work day (with normal breaks). Further, Dr. Morford found Plaintiff was capable of frequently stooping, kneeling, crouching, and crawling;

occasionally climbing ramps and stairs, and balancing; but never climbing ladders, ropes, or scaffolds. According to Dr. Morford, Plaintiff should avoid concentrated exposure to pulmonary irritants and hazards (*e.g.*, machinery, heights). In making his assessment, he noted that Plaintiff's complaints of dizziness were not fully explained in the medical examination report. He also opined that because her pulmonary functioning test results "have remained relatively stable," smoking cessation would help Plaintiff's prognosis. (R. 324.)

## IV.  DISCUSSION

The Plaintiff raises three issues on appeal. Plaintiff argues that the ALJ erred by: (1) failing to make a function by function assessment in determining that Plaintiff could perform a full range of medium work; (2) finding that Plaintiff has no limitations as a result of her COPD; and (3) failing to assess whether Plaintiff's past relevant work involved any exposure to pulmonary irritants.

### A.  The ALJ's Assessment of Plaintiff's RFC Is Supported By Substantial Evidence

Plaintiff contends that the ALJ committed reversible error by finding Plaintiff was capable of medium work without first articulating specific findings regarding Plaintiff's abilities to sit, stand, walk, lift, carry, push, and pull.[26] According to Plaintiff, these omissions make it unclear as to how the ALJ reached his decision that Plaintiff was capable of performing the exertional demands of medium work.

---

[26] Plaintiff relies upon SSR 96-8p, which provides that "The RFC assessment must first identify the individual's functional limitations or restrictions and assess . . . [her] work-related abilities on a function by function basis. . . . Only after that may RFC be expressed in terms of exertional levels of work." SSR 96-8p.

13

The Commissioner points to the definition of "medium work" as provided in the regulations[27] and asserts that, in combination with the ALJ's conclusion that Plaintiff had "mild to moderate impairments which [were] not shown to result in any physical or mental limitations," the regulations and rulings sufficiently explain the exertional demands associated with Plaintiff's assigned RFC. While the decision of the ALJ is not as thorough as the Court would expect in a Social Security Disability case, the ALJ discussed, nonetheless, the medical evidence and his evaluation of Plaintiff's RFC is supported by the limited medical evidence offered by Plaintiff.

While the ALJ is required to articulate the weight given to the evidence as well as his reasons for his decision such that a reviewing court will be able to determine whether the decision was based on substantial evidence,[28] the ALJ is not required to summarize the entire record before him in his written decision unless the unmentioned medical evidence contradicts the ALJ's conclusion.[29]

---

[27] In accord with the regulations and as further explained by Social Security Ruling 83-10, "medium work" is defined as work which encompasses:

> lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms. . . .
>
> . . . . In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

SSR 83-10.

[28] Freeman v. Barnhart, 220 Fed. Appx. 957, 959-60 (11th Cir. 2007) (citing Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)).

[29] See Cunningham v. Shalala, 880 F. Supp. 537, 551 (N.D. Ill.1995) ("[I]t is not incumbent upon the [ALJ] to specifically comment upon every bit of evidence in the record.").

Here, after finding that Plaintiff's diabetes, hypertension, depression, degenerative disc disease and COPD were severe impairments at step two of the sequential analysis, the ALJ proceeded to consider the evidence of record and concluded that "[t]here [we]re very few objective medical findings and there [was] no indication in the record that [Plaintiff] had any difficulty performing any activity at any time" as a result of her medically determined impairments. (R. 14, 16-17.) Plaintiff's medical records do not offer much—if any—information related to any functional limitations associated with Plaintiff's impairments. In fact, other than a few abnormal diagnostic test results,[30] Plaintiff's medical records document little more than Plaintiff's subjective complaints, diagnoses,[31] and predominantly normal clinical findings.

Although Plaintiff had the burden of producing evidence that her various medical conditions interfered with her ability to work, she failed to provide medical source statements from any treating or examining physicians assessing her functional capacity. The only medical assessments of Plaintiff's functional capacity provided to the ALJ were those of two state agency non-examining physicians, who limited Plaintiff to light and medium work. (R. 263-70, 319-26.)

While it may have been better for the ALJ to explicitly describe the exertional demands associated with the full range of medium work in his written decision, his

---

[30] The Court is satisfied that the ALJ gave appropriate consideration to these diagnostic test results because the ALJ stated that he carefully considered the entire record and specifically referred to the relevant abnormal test results in his written decision. (R. 14-15.)

[31] Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005); *see also* McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) ("[T]he severity of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.").

failure to do so does not constitute reversible error where, as here, the Plaintiff has not produced evidence that her impairments have an adverse impact on her capacity to do work-related activities.

Accordingly, the ALJ properly considered the documented functional limitations arising from Plaintiff's medical impairments and, after finding Plaintiff had failed to show that any of her various impairments significantly limited her ability to work, the ALJ properly evaluated Plaintiff's RFC.

**B.   The ALJ Properly Assessed the Functional Limitations Arising from Plaintiff's COPD Diagnosis.**

Plaintiff testified that she was unable to walk very far without losing her breath[32] and that she was unable to be around fumes or dust due to her breathing problems. (R. 351.) Despite this testimony, the ALJ determined that Plaintiff's COPD was a "mild" condition presenting no limitations to her ability to perform work-related activities. Plaintiff argues this was error. Specifically, Plaintiff points to pulmonary function test ("PFT") results supportive of Plaintiff's testimony and which purportedly demonstrate a pulmonary condition of the severity required to meet the listing in section 3.02A.

The Commissioner argues that Plaintiff did not satisfy her burden of producing evidence demonstrating how her COPD limited her ability to perform her former work.[33] In support of his argument, the Commissioner correctly notes that some of Plaintiff's PFT results constituted insufficient medical evidence to support a finding that Plaintiff met or equaled any listed impairment. The regulations set forth specific procedural and

---

[32] (R. 349-50.)

[33] *See* Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991).

16

technical requirements that must be met before pulmonary functioning test results are considered to be "acceptable" documentation for the purposes of meeting a listing.[34] The Commissioner argues that the Plaintiff's PFT results cannot be used to establish that Plaintiff met or equalled the listing at section 3.02A because none of them are fully compliant with the regulations. The Court agrees.

The PFT conducted in February 2005 included only one forced expiratory maneuver (R. 275) and the regulations require three forced expiratory maneuvers.[35] The PFT performed in March 2005 was also insufficient because the post-bronchodilator results exceeded the requisite levels to meet the listing at section 3.02A.[36] For each PFT administered, the highest $FEV_1$ results obtained during that test are the ones used, whether they were achieved pre- or post-bronchodilator.[37] Although Plaintiff's height is disputed,[38] 1.49 L nonetheless exceeds the $FEV_1$ value for a person between 67 and 68 inches tall without shoes.[39] The lung volume maneuver performed in April 2005 was incomplete due to a leak in the testing apparatus. (R. 276.) The August

---

[34] See 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(E).

[35] "The reported one-second forced expiratory volume ($FEV_1$) . . . should represent the largest of at least three satisfactory forced expiratory maneuvers." 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(E).

[36] (R. 256.) "Spirometry should be repeated after administration of an aerosolized bronchodilator under supervision of the testing personnel if the pre-bronchodilator $FEV_1$ value is less than 70 percent of the predicted normal value." 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(E). Because Plaintiff's highest pre-bronchodilator $FEV_1$ value was 48 percent of the predicted normal value, repeat post-bronchodilator testing was required. Plaintiff's highest post-bronchodilator $FEV_1$ value was 1.49.

[37] 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(E).

[38] Plaintiff argues that the Plaintiff's height is improperly noted as being 57.5 inches (R. 316) and 68 inches (R. 275) when she is actually 67 inches tall without shoes. (Doc. 16, p. 6.)

[39] The listing at section 3.02A depends on Plaintiff's height without shoes. 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.02A, tbl. 1. A person between 66-67 inches tall must have an $FEV_1$ equal to or less than 1.35 L. Id. A person between 68-69 inches tall must have an $FEV_1$ equal to or less than 1.45 L. Id.

2005 PFT revealed forced expiratory volume ($FEV_1$) values of 1.40 L, 1.41 L, and 1.52 L pre-medication. (R. 316.) Regardless of the resolution of the factual dispute concerning Plaintiff's height, 1.52 L exceeds the requisite $FEV_1$ value.[40] Therefore, Plaintiff has failed to produce evidence that she met or equaled the impairment listed in section 3.02A.[41]

In his written decision, the ALJ acknowledged Plaintiff's abnormal PFT results as well as her diagnosis with COPD. (R. 15.) However, after careful consideration of the entire record, the ALJ concluded that Plaintiff was not significantly impaired as a result of COPD. Notwithstanding Plaintiff's abnormal PFT results, other objective medical findings in the record contradict the Plaintiff's allegations concerning the severity of her respiratory problems. For example, progress notes reveal a history of predominantly benign clinical findings, and physical examinations of Plaintiff's lungs were consistently "normal." (R. 147, 161, 164, 168, 171, 173, 175, 177, 180, 183-84, 186-87, 189-90, 224, 239, 285-86, 288A, 290A, 327, 329, 332.) In addition, despite Plaintiff's assertions that she was unable to tolerate dust, smoke, or fumes, Plaintiff continued to smoke—an activity clearly inconsistent with her respiratory complaints.[42]

---

[40] A person between 68-69 inches tall must have an $FEV_1$ equal to or less than 1.45 L. 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.02A, tbl. 1.

[41] See Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

[42] (R. 351-52.) See, e.g., Sias v. Sec'y of Health & Human Servs., 861 F.2d 475, 480 (6th Cir. 1988) ("The Social Security Act did not repeal the principle of individual responsibility. . . . If the [Plaintiff] chooses to drive himself to an early grave, that is his privilege—but . . . he has no right to require those who pay social security taxes to help underwrite the cost of his ride.").

Finally, contrary to Plaintiff's assertion that the ALJ found no limitations associated with Plaintiff's COPD, the Plaintiff's RFC actually included an environmental limitation that Plaintiff should avoid concentrated exposure to pulmonary irritants.[43] Thus, because Plaintiff did not provide medical evidence to support any additional limitations attributable to her COPD, the ALJ appropriately considered the impact of Plaintiff's COPD when assessing her RFC.

**C.      The ALJ Properly Assessed Plaintiff's Capacity to Do Her Past Relevant Work.**

Finally, Plaintiff challenged the ALJ's failure to make any findings concerning whether Plaintiff's past relevant work as a janitor or poultry processor involved concentrated exposure to pulmonary irritants. Plaintiff points to her description of her job as a janitor in a work history report she prepared at the request of the Social Security Administration in support of her argument that she is incapable of performing her past relevant work. (R. 98.) In her job description, she noted that she "cleaned bathrooms, dusted, [and] cleaned walls" as a janitor. Plaintiff argues that her work as a janitor *as she performed the job* would necessarily expose her to pulmonary irritants and that the ALJ failed to acknowledge this possibility in making the determination that Plaintiff was able to perform her past relevant work.

The Commissioner argues that the ALJ's finding is supported by substantial evidence because Plaintiff failed to show that she could not perform her past relevant

---

[43] For relief and management of symptoms associated with COPD, physicians frequently recommend regular exercise, and avoidance of exposure to pulmonary irritants—including tobacco smoke. *See* COPD, MAYOCLINIC.COM (Mar. 15, 2007), http://www.mayoclinic.com/health/copd/DS00916.

work as she performed it *or* as it is generally performed in the national economy.[44] The Commissioner cites the same sections of the Dictionary of Occupational Titles ("DOT") Plaintiff relied upon in her brief which describe the jobs of industrial cleaner,[45] poultry farm laborer,[46] and poultry boner.[47] According to the DOT, all three jobs encompass light to medium work involving no environmental limitations. Therefore, even if the Plaintiff was unable to perform her past relevant work *as she performed it*, there is substantial objective evidence to support the ALJ's conclusion that she is capable of performing it *as it is generally performed* in the national economy. Accordingly, the Court concludes that the ALJ did not commit reversible error in his assessment of Plaintiff's capacity to perform her past relevant work.

## V. CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  The Clerk is directed to enter final judgment and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 30, 2008.

Copies to:
   All Counsel

GARY R. JONES
United States Magistrate Judge

---

[44] *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f).

[45] *Industrial Cleaner*, *in* DICTIONARY OF OCCUPATIONAL TITLES § 381.687-018 (4th ed. 1991), 1991 WL 673258.

[46] *Poultry Laborer*, *in* DICTIONARY OF OCCUPATIONAL TITLES § 411.487-018 (4th ed. 1991), 1991 WL 673428.

[47] *Poultry Boner*, *in* DICTIONARY OF OCCUPATIONAL TITLES § 525.687-066 (4th ed. 1991), 1991 WL 674454.